FILED

2022 Mar-30  PM 12:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| TOMMY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-01415-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## <u>REVERSING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Tommy Johnson appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits, based on his status/post remote right-sided parietal tumor resection, seizure disorder, and migraine headaches.  Doc. 1.  In June 2018, Plaintiff Johnson applied for disability benefits, with an alleged onset date of January 19, 2018; the Commissioner denied his claim.  Doc. 11-6 at 2; Doc. 11-3 at 4–7, 18–30.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties have consented to magistrate judge jurisdiction.  Doc. 14.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **REVERSES** the Commissioner's decision and **REMANDS** to the

Commissioner for further proceedings consistent with this memorandum opinion.

## ISSUES FOR REVIEW

In this appeal, Plaintiff Johnson argues that the court should reverse the Commissioner's decision for two reasons: (1) the Administrative Law Judge (ALJ) failed to give proper weight to the opinion of Johnson's treating physician, Dr. Sabrina Morgan-Graves; and (2) the ALJ's decision was not supported by substantial evidence. Doc. 17 at 2.

Because the court will reverse and remand for further consideration of Dr. Morgan-Graves' opinion, the court need not reach the merits of the other issue that Johnson raised in this appeal.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated

by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews applications for disability benefits in three stages:  (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.  *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant

3

work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

4

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.   Procedural background

In June 2018, Plaintiff Johnson applied for disability benefits. Doc. 11-3 at 21; Doc. 11-6 at 2–5. In his application, Johnson alleged that he became disabled on January 19, 2018. Doc. 11-6 at 2.

The SSA initially denied Johnson's claim on September 18, 2018.  Doc. 11-5 at 2–6.

The SSA granted Johnson's request for a hearing (Doc. 11-5 at 9–10, 26–31); and, on October 28, 2019, a hearing was held before an ALJ (Doc. 11-5 at 26–31; Doc. 11-3 at 21, 37–56).  A vocational expert or "VE"—Dr. Stephen Cosgrove— appeared at the hearing and testified.  Doc. 11-3 at 37–38, 52–56.

On December 10, 2019, the ALJ issued an unfavorable decision, finding that Johnson was not disabled under the Social Security Act.  Doc. 11-3 at 18–30.  On December 10, 2019, Johnson appealed that decision through counsel.  Doc. 11-5 at 63–65.

On September 10, 2020, the Appeals Council denied Johnson's request for review, and found that there was "no reason under [its] rules to review the [ALJ's] decision."  Doc. 11-3 at 2.

After the Appeals Council denied Johnson's request for review of the ALJ's decision (Doc. 11-3 at 2–7), that decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

## B.    Factual background, and the ALJ hearing

Johnson was born on August 11, 1980, and was 37 years old at the time of the alleged onset of his disability.  Doc. 11-7 at 2; Doc. 11-3 at 28.  Johnson completed two years of community college.  Doc. 11-7 at 7, 46.  In the past, Johnson held

various jobs, including work as a quality inspector and welder, but he most recently had worked as a tire enhancer (or tire builder) at Goodyear Tire. Doc. 12-7 at 46; Doc. 11-3 at 42–43, 50–51.

Johnson had worked as a tire enhancer for approximately seven years, during which time he inspected tires before they were shipped, and frequently was required to lift weights of fifty pounds or more. Doc. 11-7 at 7, 47, 77; Doc. 11-3 at 50–51. Johnson reported that he was a lead worker, and that the job required him to stoop for one hour per day, crouch for one hour per day, climb for one hour per day, handle large objects for four hours per day, and to write, type, or handle small objects for two hours per day. Doc. 11-7 at 8.

In his initial application for benefits, Johnson stated that he became disabled on January 19, 2018 (Doc. 11-6 at 2), and that he stopped working on that same date, because of his migraines and seizures (Doc. 11-7 at 6). He stated that he took several medications for these conditions, including Depakote, Dilantin, and hydrocodone. Doc. 11-7 at 8. Johnson also noted that, after having a seizure while at work in 2013, he was referred to the University of Alabama-Birmingham (UAB), where he was diagnosed with a brain tumor. Doc. 11-7 at 12–13. That tumor was removed at UAB, and Johnson missed approximately six months of work due to the surgery. Doc. 11-7 at 13. After returning to work, Johnson worked full-time until he stopped working in 2018. Doc. 11-7 at 13.

In a function report dated July 17, 2018, Johnson stated that he sometimes is able to take care of his children and grandchildren.  Doc. 11-7 at 36.  He stated that his medications and migraines sometimes make it difficult for him to sleep, and that his ability to take care of personal hygiene, including dressing, bathing, and shaving, depends on how badly his head is hurting.  Doc. 11-7 at 36.  Johnson stated that he "can't even get out of bed sometime[s] to get dressed."  Doc. 11-7 at 36.

Johnson stated in the function report that he needs reminders to take his medications, but that he can prepare simple meals for himself on a daily basis, and that he can take out the trash, wash clothing and dishes, and complete other minor chores.  Doc. 11-7 at 37.  Johnson also stated that he avoids leaving the house alone, except in an emergency, because he is "afraid of what may happen."  Doc. 11-7 at 38.  Johnson stated that he feels "weak and dizzy at times and hardly feel[s] well enough to complete anything."  Doc. 11-7 at 40.  He stated that his conditions affect his ability to stand, walk, talk, hear, and see, as well as his memory, ability to complete tasks, concentration, understanding, and ability to get along with others.  Doc. 11-3 at 40.

As part of the SSA disability application process, Johnson also completed both a headache questionnaire and a seizure questionnaire.  Doc. 11-7 at 28–31, 44–45.

In response to the headache questionnaire, Johnson reported that his

headaches are migraines that began after his surgery to remove the tumor in 2013. Doc. 11-3 at 29.  Johnson reported that his migraines occur daily, that they last from between six hours to all day, and that they make him sensitive to light.  Doc. 11-3 at 29.  Johnson reported that he has not been able to find a medication that helps with his migraines, that some medications make him dizzy or drowsy, and that one medication even caused hallucinations.  Doc. 11-3 at 30.  Johnson reported that he usually goes to sleep in order to escape the migraine pain.  Doc. 11-3 at 31.

In response to the seizure questionnaire, Johnson reported that he has had seizures since he was five years old, that he loses consciousness during the seizures, and that they typically last 10-to-15 minutes.  Doc. 11-3 at 44.  Johnson reported that, after a seizure, he feels disoriented and is too weak to do anything.  Doc. 11-3 at 44.  Johnson also reported that his seizure medications, Depakote and Dilantin, cause drowsiness and dizziness, but that if he misses taking his medications then he may have a seizure.  Doc. 11-3 at 45.

At the ALJ hearing on October 28, 2019, Johnson testified that he left his job at Goodyear because of his medical issues.  Doc. 11-3 at 42.  He testified that he repeatedly had to miss work because of his migraines and seizures, and because of the side effects from his medications.  Doc. 11-3 at 42–43.  Johnson testified that he has seizures every three months, despite taking his medications as prescribed.  Doc. 11-3 at 43.  He described the seizures as grand mal seizures that leave him very

drained and unable to move for one-to-three hours afterwards.  Doc. 11-3 at 43.

Johnson testified that the only way to deal with his migraines is to take his medications and to lie down, although the medications do not work most of the time. Doc. 11-3 at 44.  He testified that, due to migraines, he spends most of his time between 8:00 am and 5:00 pm, or at least 10 hours per day, lying down.  Doc. 11-3 at 44.  Johnson testified that bright lights exacerbate his headaches.  Doc. 11-3 at 48.

Johnson also testified that he recently had experienced tinnitus (ringing in his ears), which he believed was associated with the migraines, and back pain that he believed may have been caused by the migraines.  Doc. 11-3 at 45.

Johnson testified that the back pain sometimes limits his ability to lift, sit, and/or stand.  Doc. 11-3 at 46.  And he testified that he cannot get out of bed between 20 and 25 days out of a 30-day period.  Doc. 11-3 at 46.  Johnson reiterated that his headache and seizure medications make him dizzy, sleepy, and drowsy, and that sometimes he just takes the medications and "[lies] down and hope[s] for the best." Doc. 11-3 at 47.  He testified that one medication caused him to hallucinate and see bugs that "weren't actually there," but that his doctor discontinued that medication. Doc. 11-3 at 47.  Johnson testified that the medication side effects usually begin 15-to-30 minutes after he takes the medications, and can put him to sleep for 3-to-8 hours.  Doc. 11-3 at 47.  But Johnson testified that he was able to drive a car for an hour at a time.  Doc. 11-3 at 48.

Johnson further testified regarding the astrocytoma (or tumor), which he had removed from the area around the base of his skull.  Doc. 11-3 at 45.  Johnson testified that his doctors had hoped that operating on the astrocytoma would stop his seizures, but that he continues to experience seizures.  Doc. 11-3 at 45–46.

As noted above, vocational expert (VE) Dr. Stephen Cosgrove also testified at the ALJ hearing.  Doc. 11-3 at 49–56.  Dr. Cosgrove described Johnson's past work as a tire builder as "hard work," and as a heavy, very heavy as performed, semi-skilled job.  Doc. 11-3 at 49.  Dr. Cosgrove also described two other jobs that Johnson previously had performed—as a spot welder, and as a caregiver (or personal care attendant).  Doc. 11-3 at 52.  Dr. Cosgrove described Johnson's work as a spot welder as a medium, unskilled job, and his work as a caregiver as a medium, very heavy as performed, semi-skilled job.  Doc. 11-3 at 53.

## C.   Plaintiff Johnson's medical history and records

As explained above, Johnson has a long history of seizures and migraines.  On March 21, 2012, Dr. Richard H. Chin, at Neurological Associates, P.C., completed a neurological consultation for Johnson.  Doc. 11-9 at 170–72.  At that time, Dr. Chin noted that Johnson "began having seizures approximately five years ago," and that the seizures consisted of flashing lights, sometimes accompanied by loss of consciousness and shaking extremities.  Doc. 11-9 at 170.  Johnson continued to see Dr. Chin throughout 2013.  Doc. 11-9 at 1, 167–73.

During an October 2, 2013 follow-up visit, Dr. Chin wrote that Johnson's "headache[s] can be so severe that he has difficulty walking," and that the headaches "occur two to three [t]imes per week." Doc. 11-9 at 168.  Dr. Chin also noted that Johnson was "unable to get any medication that is relieving the [head]aches."  Doc. 11-9 at 168.

Dr. Chin referred Johnson to the Kirklin Clinic at UAB, after an MRI indicated that Johnson had a brain lesion.  Doc. 11-9 at 42.  The medical notes from UAB state that Johnson began having seizures around age 5, that the seizures resolved, and that Johnson then began having complex, generalized seizures again around age 18.  Doc. 11-9 at 6.  Johnson received treatment from UAB, including a biopsy, surgery, and ongoing MRI monitoring, for a brain lesion or astrocytoma (tumor).  Doc. 11-9 at 19.

Around October 2015, Johnson also began receiving treatment from Sabrina Morgan-Graves, M.D. at Prime Healthcare Services.  Doc. 11-9 at 93–94.  Johnson continued receiving medical care from Dr. Morgan-Graves from 2015 through at least the time of the ALJ hearing.  Doc. 11-9 at 77–90; Doc. 11-10 at 34–38.

Although it appears that Dr. Morgan-Graves was Johnson's primary care physician, she regularly treated Johnson for his seizures and headaches, in addition to the treatment that he received from his neurologists.  On February 2, 2016, she noted that the severity of Johnson's seizures was "moderate," and that the seizures

were helped by therapeutic drug levels.  Doc. 11-9 at 90.  On May 3, 2016, Dr. Morgan-Graves referred Johnson for a neurology consultation due to his "persistent" headaches and seizures.  Doc. 11-9 at 87.  On August 25, 2016, Dr. Morgan-Graves noted that Johnson recently had headaches, but no seizures.  Doc. 11-9 at 84.  On November 10, 2016, Dr. Morgan-Graves noted that while Johnson's seizures were stable, they occurred "1-2 times per month" and "interfere[d] with work."  Doc. 11-9 at 82.  On November 2, 2017, Dr. Morgan-Graves noted that Johnson had some recent headaches, but no recent seizures, and that Johnson had missed work frequently due to medical issues.  Doc. 11-9 at 77.  For his headaches and seizures, Dr. Morgan-Graves advised Johnson to visit his neurologist, Dr. Gary Mellick.  Doc. 11-9 at 77.

Johnson received care from Dr. Gary Mellick at Dekalb Neurology and Sleep from approximately October 2016 through July 2018.  Doc. 11-9 at 147–58.  Dr. Mellick first treated Johnson on October 18, 2016.  On that date, Johnson stated that he always had migraines, but that after the surgery for his brain lesion those headaches had "gr[own] in intensity and are debilitating."  Doc. 11-9 at 147.

On four separate occasions throughout 2018, Johnson reported to Dr. Mellick that his headaches were not improving and were interfering with his ability to work.  Doc. 11-9 at 133–40.  Johnson's medical records indicate that, although he saw Dr.

Mellick in 2018, Johnson did not see Dr. Morgan-Graves from late 2017 until early 2019.  Doc. 11-9 at 1; Doc. 11-10 at 1.

On June 12, 2018, Johnson reported to Dr. Mellick that "he is taking the Dilantin and the Trileptal," and that "the Trileptal caused him to hallucinate but he is still taking the medication."  Doc. 11-9 at 134.  Dr. Mellick adjusted the medications because of Johnson's complaints regarding the hallucinogenic side effects.  Doc. 11-9 at 135.

On January 11, 2019, Johnson returned to Dr. Morgan-Graves to re-establish care.  Doc. 11-10 at 38.  During that visit, Dr. Morgan-Graves noted that Johnson needed a neurology consultation for his headaches, and that Johnson's seizure condition was stable, but that the seizures occurred 1-to-2 times per month and lasted for 2-to-3 minutes.  Doc. 11-10 at 38.

On February 25, 2019, Dr. Morgan-Graves again noted that Johnson needed a follow-up with neurology (Doc. 11-10 at 36), and on June 11, 2019, Dr. Morgan-Graves noted that Johnson needed a referral—specifically, to a new neurologist for seizure and headache medications, because Dr. Mellick had retired.  Doc. 11-10 at 33.

On November 18, 2019, Dr. Morgan-Graves completed a "Physical Capacities Form" (or examination or "PCE") as Johnson's treating physician of approximately four years.  Doc. 11-10 at 42.  Dr. Morgan-Graves found that, because

of his physical symptoms, Johnson would be off-task 80% of a normal workday, and that he would fail to report to work 10-to-12 days per 30-day work period. Doc. 11-10 at 42. Dr. Morgan-Graves also found that the medications Johnson takes for his seizures and migraines have multiple side effects, including dizziness, sleepiness, mood swings, and poor concentration. Doc. 11-10 at 42.

### D.   The ALJ's decision

On December 10, 2019, the ALJ issued an unfavorable decision on Johnson's disability claim. Doc. 11-3 at 18–30. The ALJ found that Johnson was 37 years old on the alleged onset date of his disability (January 19, 2018), and that Johnson had not engaged in substantial gainful activity since that alleged onset date. Doc. 11-3 at 23, 29.

At step two of the sequential analysis, the ALJ found that Johnson had severe impairments of status/post remote right-sided parietal tumor resection, seizure disorder, and migraine headaches. Doc. 11-3 at 23. The ALJ also noted that Johnson alleged that he was experiencing tinnitus and back pain, which Johnson associated with his migraines. Doc. 11-3 at 23. The ALJ found that, because the record contained no medical evidence establishing the existence of back pain or tinnitus, the existence of those impairments could not be medically determined. Doc. 11-3 at 23.

At step three, the ALJ found that Johnson did not have an impairment or

combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments."  Doc. 11-3 at 24.  The ALJ next assessed Johnson's "residual functional capacity" (RFC), and found that Johnson had the RFC to perform light work, except that he must avoid unprotected heights, hazardous moving machinery, commercial driving, and open bodies of water.  Doc. 11-3 at 24.  The ALJ's RFC determination also indicated that Johnson could have occasional exposure to extreme temperatures and excessive vibration, but that noise levels should be limited to moderate.  Doc. 11-3 at 24.

After assessing Johnson's RFC, at step four, the ALJ concluded that Johnson was unable to perform any of his past relevant work, including as a tire builder, spot welder, or caregiver.  Doc. 11-3 at 28.

But, at step five, after considering Johnson's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that Johnson could perform.  Doc. 11-3 at 29.

Consequently, the ALJ determined that Johnson was not disabled under the Social Security Act. Doc. 11-3 at 30.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court will reverse and

remand because substantial evidence did not support the ALJ's conclusion that the opinion of Plaintiff Johnson's treating physician was unpersuasive.  The court will pretermit consideration of the other issue that Johnson raised in this appeal.

**I.      Substantial evidence did not support the ALJ's conclusion that the opinion of Dr. Sabrina Morgan-Graves, Plaintiff Johnson's treating physician, was unpersuasive.**

Substantial evidence did not support the ALJ's conclusion that the opinion of Plaintiff Johnson's treating physician, Dr. Sabrina Morgan-Graves, was unpersuasive.  On appeal, Johnson argues that Dr. Morgan-Graves' opinion "[wa]s well supported by clinical and laboratory findings, and not inconsistent with other substantial evidence."  Doc. 17 at 27.

Much of the parties' briefing focuses on the legal question of the applicable standard—i.e., whether the ALJ was required to evaluate Dr. Morgan-Graves' opinion under the Eleventh Circuit's "treating physician rule" or the SSA's revised regulations on the consideration of medical opinions.  *See, e.g.*, Doc. 17 at 20, 27; Doc. 18 at 1; *see also* Doc. 21 (Plaintiff Johnson's supplemental brief); Doc. 24 (Commissioner's supplemental brief).  But, regardless which standard applies, the problem is evidentiary—not legal.

Legally, the Eleventh Circuit's treating physician rule long has required that an ALJ give the opinion of a treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary."  *Phillips v. Barnhart*, 357 F.3d 1232,

1240 (11th Cir. 2004) (citation and quotation marks omitted).[1]  Good cause exists under the following circumstances:  "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1240–41.

But in a recent unpublished opinion the Eleventh Circuit reasoned that, "[f]or claims filed on or after March 27, 2017, . . . no significant weight is given to statements made by treating physicians as opposed to non-treating medical sources." *Planas ex rel. A.P. v. Commissioner of Soc. Sec.*, 842 F. App'x 495, 497 n.1 (11th Cir. 2021).

That is because the SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.[2]  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating physician.    20 C.F.R.

---

[1] The Eleventh Circuit and other Courts of Appeals developed the treating physician rule "as a means to control disability determinations by administrative law judges under the Social Security Act."  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003).

[2] "[T]he Eleventh Circuit does not recognize the treating physician rule as independent from the regulations."  *Lemons v. Kijakazi*, No. 4:20-CV-1267-RDP, 2022 WL 19626, at *6 (N.D. Ala. Jan. 3, 2022).

§§ 404.1520c(a), 416.920c(a).

Instead, the ALJ considers the persuasiveness of a medical opinion using the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. §§ 404.1520c(b)(2). The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

In this case, the ALJ applied those new, revised regulations.[3]  But substantial evidence did not support the ALJ's determination that Dr. Morgan-Graves' opinion was not persuasive.  And, for the same reason, there was not good cause to discount that opinion under the treating physician rule (if it still were to apply).  *See Phillips*,

---

[3] The ALJ stated the following:  "As for the medical opinions . . . , the regulations provide that we will not defer or give any specific evidentiary weight, including controlling weight, to any . . . medical opinions, including those from medical sources . . . .  When evaluating a medical opinion we consider supportability, consistency, relationship with the claimant, specialization, and other factors pursuant to 20 C.F.R. § 404.1520(c) and 416.920(c)."  Doc. 11-3 at 27.

357 F.3d at 1240–41.

As explained above, Dr. Morgan-Graves (Johnson's treating physician) opined in a "Physical Capacities Form" (or "PCE") dated November 18, 2019, that Johnson would be off-task 80% of an 8-hour day, and would fail to report to work 10-to-12 days per 30-day period.  Doc. 11-10 at 42.  Dr. Morgan-Graves also found that the side effects of Johnson's medications for his seizures and migraines include "[d]izziness, sleepiness, weakness, mood swings, and poor concentration."  Doc. 11-10 at 42.

The ALJ concluded that Dr. Morgan-Graves' opinion was "not persuasive."  Doc. 11-3 at 28.[4]  The ALJ acknowledged that Dr. Morgan-Graves "supported her opinions with some explanation"; but, according to the ALJ, her opinions "[we]re not supported or consistent with the other evidence."  Doc. 11-3 at 28.

The ALJ continued:  "Specifically, her opinions are not supported by her own treatment notes, which fail to denote the severity or frequency of seizures, migraines, or side effects to support the limitations described in her PCE."  Doc. 11-3 at 28.  "Additionally, the limitations are not supported by the claimant's neurology treatment notes."  Doc. 11-3 at 28 (citing Exhibits 4F and 6F).

_____

[4] "The [ALJ] considered the opinions contained in a physical capacities form (PCE) from the claimant's primary care provider, Sabrina Morgan-Graves, M.D., wherein she opined that the claimant would be expected to miss ten to twelve days a month, and/or be off task eighty percent of a workday due to symptoms from headaches and seizures."  Doc. 11-3 at 28 (citing Exhibit 12F).

It is clear that the ALJ was addressing the supportability and consistency factors. 20 C.F.R. §§ 404.1520c(c). Less clear was the factual basis—much less an adequate factual basis—for the ALJ's determination that Dr. Morgan-Graves' opinion was not persuasive. Again (in relevant part), the ALJ's decision states (1) that Dr. Morgan-Graves' "opinions are not supported by her own treatment notes," and (2) that the "limitations" as to which Dr. Morgan-Graves opined "are not supported by the claimant's neurology treatment notes." Doc. 11-3 at 28; *see supra*.

*1.* With respect to Dr. Morgan-Graves' "own treatment notes," the record evidence directly contradicts the ALJ's finding that those "notes . . . fail to denote the severity or frequency of seizures, migraines, or side effects to support the limitations described in her PCE." Doc. 11-3 at 28. Instead, Dr. Morgan-Graves' treatment notes specifically and repeatedly address the severity and frequency of Johnson's seizures and migraines.

For example, a progress note dated January 11, 2019, indicated that the "nature of seizures is 1-2 times per month," and that the seizure duration "is 2-3 minutes." Doc. 11-10 at 38. At that same visit, Dr. Morgan-Graves noted that Johnson needed a neurology consultation regarding his migraines, and that Johnson had "diffuse" headaches. Doc. 11-10 at 38.

Moreover, in a separate—but apparently or arguably related—part of the ALJ's residual functional capacity (RFC) determination, the ALJ found that

"[s]ubsequent follow up visits in February and June 2019 . . . fail[ed] to document the severity or frequency of headaches alleged by the claimant."  Doc. 11-3 at 26 (citing Exhibit 11F).  But the record contradicts that finding as well.

In particular, on February 25, 2019, Dr. Morgan-Graves made treatment notes regarding Johnson's seizures and headaches that were similar to those from January 11, 2019.  Doc. 11-10 at 36; *see supra*.

And, during an annual wellness examination on June 11, 2019, Dr. Morgan-Graves noted that Johnson's former neurologist had retired, and that Johnson needed a referral to a new neurologist for seizure management.  Doc. 11-10 at 33.  Dr. Morgan-Graves' treatment notes from that annual examination also indicated that Johnson had admitted to headaches in his systems review, and that Johnson had worsening ringing in his ears.  Doc. 11-10 at 33.

Thus, the ALJ's findings regarding Dr. Morgan-Graves' treatment notes were not supported by substantial evidence.

*2.*  The record evidence also contradicts the ALJ's finding that Dr. Morgan-Graves' opinion "[was] not supported by the claimant's neurology treatment notes." Doc. 11-3 at 28.  A review of Johnson's neurology medical records shows that there are ample examples of treatment notes—from both Dr. Richard H. Chin and Dr. Gary Mellick—that support and that are consistent with Dr. Morgan-Graves' opinion.  *See, e.g.*, Doc. 11-9 at 168 ("headache can be so severe that [Johnson] has

difficulty walking"); Doc. 11-9 at 147–48 ("[Johnson] reports frequent or severe headaches"); Doc. 11-9 at 140 ("[Johnson] reports headaches are not really improving"); Doc. 11-9 at 158 ("[Johnson] says he constantly has a headache").

Again, it appears—or it is the court's "best guess"—that the ALJ's determination that Dr. Morgan-Graves' opinion was not persuasive related back to a separate discussion in the ALJ's decision about Johnson's RFC. *See* Doc. 11-3 at 26. There, the ALJ discussed "[n]eurology treatment notes" and found that those notes showed, among other things, "no more than mild pain" in February 2018 ("a four on a one to ten scale"), and "no more than mild/moderate pain" in June 2018 ("a pain level of five out of ten"). Doc. 11-3 at 26.

But, even in that discussion, the ALJ found that those neurology treatment notes showed "a pain level of seven out of ten" in both April and July 2018. Doc. 11-3 at 26.

Furthermore, the ALJ appeared to make much of a "gap" in treatment "of over a year" or "for several months." Doc. 11-3 at 25; *see also id.* ("despite no treatment in more than a year"); *id.* ("despite a lack of follow-up care in several months"). But that finding too was incorrect, or at least incomplete. As explained above, the only gap in treatment was from June 2018 (when Johnson saw his neurologist) until January 2019 (when Johnson re-established care with Dr. Morgan-Graves), which

seems to have coincided with the retirement of Johnson's neurologist.  Doc. 11-9 at 1; Doc. 11-10 at 1.

So, the ALJ's findings regarding Johnson's neurology treatment notes were not supported by substantial evidence either.

Plus, practically speaking, part of the problem is that the court had to make the above "best guess" connection at all—that is, the apparent or arguable connection between the ALJ's determination that Dr. Morgan-Graves' opinion was not persuasive (Doc. 11-3 at 28), and the ALJ's separate discussion of Johnson's RFC (Doc. 11-3 at 26).  The new regulations required the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions."  *See* 20 C.F.R. § 416.920c(b)(2).  But, in light of the record evidence contradicting the ALJ's findings with respect to Dr. Morgan-Graves' own treatment notes and Johnson's neurology treatment notes, the court itself is guessing and grasping for "such relevant evidence as a reasonable person would accept as adequate to support [the ALJ's] conclusion" that Dr. Morgan-Graves' opinion was not persuasive. *See Crawford*, 363 F.3d at 1158.  In a situation like this, the Eleventh Circuit has instructed that the court should not guess.  The court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for the ALJ's. *Winschel*, 631 F.3d at 1178.

In sum, given the contradictions discussed above, and reviewing the record

evidence and the ALJ's decision, the court cannot say that substantial evidence supported the ALJ's decision.  Substantial evidence did not support the ALJ's determination that Dr. Morgan-Graves' opinion was unpersuasive pursuant to the supportability and consistency factors under the revised regulations, *see* 20 C.F.R. §§ 404.1520c(c); nor was there substantial evidence to support a finding of good cause to discount that opinion under the treating physician rule (were it still to apply), *see Phillips*, 357 F.3d at 1240–41.

## II.   The court pretermits consideration of the other issue that Plaintiff Johnson raised in this appeal.

Because the court will reverse and remand for further consideration of Dr. Morgan-Graves' opinion (*see* Part I *supra*), the court pretermits consideration of the other issue that Plaintiff Johnson raised in this appeal.  As noted above, Johnson also has argued that the ALJ's "unfavorable decision [wa]s not based on substantial evidence."  Doc. 17 at 30.  Johnson argues that the ALJ "disregarded the opinion of the treating physician" (*id.*), which the court discussed above in Part I.

Johnson argues further that the ALJ "relied on Vocational Expert testimony that was not based on a correct or full statement of Claimant's limitations and impairments."  Doc. 17 at 30.  But the court need not—and will not—reach this issue.  *See Demenech v. Secretary of the Dep't of HHS*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (court need not consider other issues when remanding); *accord Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court

**REVERSES** the Commissioner's decision and **REMANDS** to the Commissioner

for further proceedings consistent with this memorandum opinion.  The court

separately will enter final judgment.

**DONE** and **ORDERED** this March 30, 2022.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE